STATE OF INDIANA *v.* PRUDENTIAL INSURANCE COMPANY OF AMERICA, NEWARK, NEW JERSEY.

[No. 28,127. Filed December 21, 1945. Rehearing Denied January 16, 1946.]

*James A. Emmert,* Attorney General, *Cleon H. Foust,* First Deputy Attorney General, and *Winslow Van Horne,* Deputy Attorney General, for appellant.

*Joseph J. Daniels, William G. Davis,* and *Paul N. Rowe (Baker & Daniels,* of Counsel), all of Indianapolis, for appellee.

YOUNG, C. J.—This action involves the constitutionality of Indiana's Insurance Premium Tax Law, which reads as follows:

"(a) Every insurance company not organized under the laws of this state and doing business within this state shall, on or before the first day of March of each year, report to the department, under the oath of the president and secretary, the gross amount of all premiums received by it on policies of insurance covering risks within this state, or in the case of marine or transportation risks, on policies made, written or renewed within this state during the twelve-months' (12) period ending on the thirty-first day of December of the preceding calendar year. From the amount of gross premiums, shown as above provided, shall be deducted (1) losses actually paid, within this state, (2) considerations received for reinsurance of risks within this state from companies authorized to transact an insurance business in this state, (3) the amount of dividends paid or credited to resident insureds, or used to reduce current premiums of resident insureds, (4) the amount of premiums actually returned to residents on account of applications not accepted or on account of policies not delivered and (5) the amount of unearned premiums returned on account of the cancellation of policies covering risks within the state. At the time of making the report required above every such insurance company shall pay into the treasury of this state for the privilege of doing business in this state, an amount equal to three (3) per cent of the excess, if any, of the gross premiums over the deductions allowed herein.

"(b) Any insurance company failing or refusing for more than thirty (30) days, to render an accurate account of its premium receipts as above provided and pay the tax due thereon, shall be subject to a penalty of one hundred dollars ($100) for each additional day such report and payment shall be delayed, to be recovered in an action in the name of the state of Indiana on the relation of the department of insurance, in any court of competent jurisdiction, and it shall be the duty of the

department to revoke all authority of such defaulting company to do business within this state, or suspend such authority during the period of such default in the discretion of the department." § 39-4802, Burns' 1933.

While domestic Indiana insurance companies are not required to pay the three (3) per cent premium tax they are required (subject to statutory deductions not unlike the deductions in premium tax law) to pay a one (1) per cent tax upon gross income, including interest, rent, dividends and all income as well as premium receipts upon Indiana policies. This income tax is not applicable to foreign companies. Domestic companies are likewise subject to a capital stock tax based upon the difference between the value of their stock and the value of real estate and personal property upon which *ad valorem* taxes are paid, and this capital stock tax is not required of foreign insurance companies. *Ad valorem* property taxes are assessed against both foreign and domestic insurance companies but in the natural course of events the foreign companies pay the bulk of their *ad valorem* property taxes in the states of their origin and the Indiana companies pay the bulk of such taxes in Indiana. The stipulations show that in 1944 appellee, with total assets of almost $6,000,000,000, paid taxes of only $11,703.20 on real estate and $620.36 on tangible personal property in Indiana. Schedules in the stipulation indicate that the actual premium tax paid by appellee amounts to a little over $.0190 per premium dollar collected in Indiana and total taxes of all kinds per premium dollar on Indiana business of domestic companies average about $.0133.

Appellee is a corporation organized under the laws of New Jersey and is engaged in writing life and other insurance contracts throughout the nation under the

direction of a board of directors and executive officers in the City of Newark, New Jersey. It has outstanding insurance contracts amounting to almost 23 billion dollars. The conduct of its business requires the movement of information, documents and money across state lines by mail, telephone, telegraph and express.

Appellee was first authorized and licensed to do business in Indiana in 1903 and at that time there was, and continuously since 1891 there has been, in effect in Indiana a premium tax law substantially the same as above quoted.

Since 1903 appellee has developed a very large insurance business in Indiana. On December 31, 1944, it maintained 53 district offices in Indiana wherein 256 persons were employed and it had 636 agents engaged in selling insurance in Indiana and 347 physicians who examined applicants for policies. At that time it had in force 1,332,785 policies insuring the lives of approximately 866,000 persons resident in Indiana for a total amount of over $726,000,000. During the year ending December 31, 1944, it sold and issued and delivered policies insuring the lives of approximately 74,000 persons resident in Indiana for a total amount of $81,-915,223, and during that year it paid over $7,000,000 in claims on policies upon the lives of Indiana residents. It had over $619,000 deposited in Indiana banks.

Under appellee's method of transacting business applications for insurance policies are solicited and received by agents of appellee in Indiana. Examinations and investigations of prospective risks are made by local physicians and investigators. All applications and reports are transmitted by its agents in Indiana to the home office in Newark, New Jersey, where they are considered and acted upon and where all policies are signed and made ready for delivery. Policies are then

transmitted from the home office to the agents of appellee in Indiana and by such Indiana agents are delivered in Indiana to the respective applicants insured under such policies. All premiums are paid to Indiana offices of appellee and deposited in Indiana banks.

On February 28, 1945, appellee filed reports with the Auditor of State showing gross premiums received during 1944 to be $23,574,055.17 with deductions of $8,495,473.07, or a taxable net of $15,078,582.10, upon which the tax at three (3) per cent was $452,357.44, which sum appellee paid to the Treasurer of Indiana under protest, after correspondence with the Auditor of State indicating that if same were not paid penalties would be assessed and its right to do business in Indiana would be challenged.

After paying this tax, appellee brought suit to recover same and obtained a judgment for the full amount, plus interest, in the sum of $8,848.86, and from this judgment this appeal has been taken.

Appellee contends that in the light of the Supreme Court opinion in *United States* v. *South-Eastern Underwriters Assn.* (1944), 322 U. S. 533, 88 L. Ed. 1440, 64 S. Ct. 1162, the premium tax authorized by the Indiana statute violates the commerce clause of the Federal Constitution and the equal protection clause of the Fourteenth Amendment. In our consideration of these contentions we have had in mind, in addition to the facts already mentioned, that when appellee first entered Indiana to do business the same three (3) per cent premium tax was imposed by our statutes that is imposed today, and that it came and has stayed voluntarily and has prospered and has built up a business in Indiana that in 1944 was more than double the Indiana business of all life insurance companies organized in Indiana put together. It has paid this tax con-

tinuously every year without protest or objection. It has adjusted its Indiana business to the requirements of the statute without finding the burden too heavy or practically discriminating, and Indiana has adjusted its fiscal policy and governmental financing to the income so derived and has evolved through the years a tax structure of which this premium tax, with 108 foreign life insurance companies doing business in Indiana, has become an indispensable part.

The reason that this premium tax has gone unchallenged so long is that in *Paul* v. *Virginia* (1869), 8 Wall. 168, 19 L. Ed. 357, it was held that, "issuing a policy of insurance is not a transaction of commerce," and that "such contracts are not inter-state transactions, though the parties may be domiciled in different states," but "are, then, local transactions, and are governed by the local law."

*Paul* v. *Virginia* was accepted by the states as authorizing them to regulate the business of insurance and in the case of *New York Life Insurance Co.* v. *Deer Lodge County* (1913), 231 U. S. 495, 58 L. Ed. 332, 34 S. Ct. 167, a premium receipts tax very similar to the Indiana tax was challenged and upon the authority of *Paul* v. *Virginia, supra,* and the cases following it, it was held that the state had not contravened the commerce clause of the Federal Constitution. Thereafter, until June 5, 1944, the *Paul* v. *Virginia* case, *supra,* and the *New York Life Insurance Co.* v. *Deer Lodge County* case, *supra,* were followed by still further decisions of the Supreme Court of the United States, and Indiana and 28 other states (according to the stipulation filed herein) have taxed foreign insurance companies upon the basis of a percentage of their premium receipts in such states respectively.

On June 5, 1944, however, came the case of *United*

*States* v. *South-Eastern ' Underwriters Association,* *supra,* and upon the strength of the opinion in that case appellee herein has contended that the *Paul* v. *Virginia* case, *supra,* and the *Deer Lodge County* case, *supra,* have been by implication overruled and that the conduct of the states based upon those cases taxing insurance companies upon the basis of their premium receipts contravenes the commerce clause of the Federal Constitution.

Upon the meaning and implications of the South-Eastern Underwriters case depends a decision of the case before us. Does that case overrule *Paul* v. *Virginia, supra,* and the *Deer Lodge County* case, *supra,* insofar as those cases permitted the several states to tax insurance companies upon the basis of premium receipts on policies delivered in and to citizens of the several states?

It seems to us that Mr. Justice Black, who wrote the prevailing opinion in the South-Eastern Underwriters case, indicated that there was no such intention. He started his opinion with these words:

> "For seventy-five years this Court has held, whenever the question has been presented, that the Commerce Clause of the Constitution does not deprive the individual states of power to regulate and tax specific activities of foreign insurance companies which sell policies within their territories. Each state has been held to have this power even though negotiation and execution of the companies' policy contracts involved communications and information and movements of persons, moneys, and papers across state lines. Not one of all these cases, however, has involved an Act of Congress which required the Court to decide the issue of whether the Commerce Clause grants to Congress the power to regulate insurance transactions stretching across state lines. Today for the first time in the history of the Court that issue is squarely presented and must be decided."

By these words, he indicated that the rights of the states to tax were not involved as in the earlier cases, but only the right of Congress to regulate certain aspects of the insurance business through the Sherman Act was presented. He starts out with forthright recognition of this distinction between the earlier cases and the case before him. He points out that consistently and continuously for a long time our highest court, in every case before it involving the question has held that the states have the power to regulate and tax foreign insurance companies doing business within their borders, but not one of these cases was overruled, notwithstanding definite recognition and careful consideration of the doctrine established by them. On the contrary, the following language appearing on pages 546 and 547 of the opinion, seems to justify the state regulation approved in *Paul* v. *Virginia, supra,* and the *Deer Lodge County* case, *supra,* and the cases following them:

"Another reason advanced to support the result of the cases which follow Paul v. Virginia has been that if any aspects of the business of insurance be treated as interstate commerce, 'then all control over it is taken from the States and the legislative regulations which this Court has heretofore sustained must be declared invalid.' Accepted without qualification, that broad statement is inconsistent with many decisions of this Court. *It is settled that, for Constitutional purposes, certain activities of the same business may be intrastate and therefore subject to state control, while other activities of the same business may be interstate and therefore subject to federal regulation. And there is a wide range of business and other activities which, though subject to federal regulation, are so intimately related to local welfare that, in the absence of Congressional action, they may be regulated or taxed by the states. In marking out these activities the primary test applied by the Court is not the mechanical one of whether the particular activity affected by the state regulation is part of interstate commerce,*

*but rather whether in each case, the competing demands of the state and national interests involved can be accommodated. And the fact that particular phases of an interstate business or activity have long been regulated or taxed by states has been recognized as a strong reason why, in the continued absence of conflicting Congressional action, the state regulatory and tax laws should be declared valid."* (Our italics.)

This language, from the opinion, indicates an intent not to hold that treating some aspects of the insurance business as interstate commerce and subjecting it to the operation of the Sherman Act, outlaws all state regulation and taxation of the insurance business in any of its phases or aspects. The italicized words are peculiarly applicable to the case before us. Appellee's Indiana business is thoroughly local, as we have shown in outlining the facts earlier in this opinion. There is not and never has been any congressional action in conflict with the Indiana statute under attack. The competing demands of state and national interests have been accommodated through the passing years, otherwise the company would not have stayed and prospered. The same is true of numerous other states which long have regulated and taxed foreign insurance companies upon the basis of premium receipts. As stated by Mr. Justice Jackson, in his dissenting opinion:

"The states began nearly a century ago to regulate insurance, and state regulation, while no doubt of uneven quality, today is a successful going concern. Several of the states, where the greatest volume of business is transacted, have rigorous and enlightened legislation, with enforcement and supervision, in the hands of experienced and competent officials. Such state departments, through trial and error, have accumulated that body of institutional experience and wisdom so indispensable to good administration. . . ."

Further applying the language quoted from the main opinion, the fact that Indiana and numerous other states have long taxed insurance premiums with complete absence of congressional action, gives strong reason to believe the Supreme Court did not intend that all state regulatory and tax laws should be invalid.

As further indication that the Court, when it handed down its opinion in the South-Eastern Underwriters case, did not intend to outlaw all taxation and regulation of the insurance business by the states, we may look to the case of *Polish National Alliance* v. *National Labor Relations Board* (1944), 322 U. S. 643, 88 L. Ed. 1509, 64 S. Ct. 1196. In that case again an Act of Congress as it related to the insurance business was involved. The National Labor Relations Act was applied to an insurance company and was held constitutional. The opinion contained the following language, beginning at the bottom of page 648:

". . . The long series of insurance cases that have come to this Court for more than seventy-five years, from Paul v. Virginia, 8 Wall. (US) 168, 19 L ed 537, to New York L. Ins. Co. v. Deer Lodge County, 231 US 495, 58 L ed 332, 34 S Ct 167, have invariably involved some exercise of state power resisted, in most instances, on the claim that it was impliedly forbidden by the Commerce Clause. Such was the context in which this Court decided again and again that the making of a contract of insurance is not interstate commerce and that, since the business of insurance is in effect merely a congeries of contracts, the States may, for taxing and diverse other purposes, regulate the making of such contracts and the insurance business free from the limitations imposed upon state action by the Commerce Clause. *Constitutional questions that look alike often are altogether different and call for different answers because they bring into play different provisions of the Constitution or different exertions of power under it. Thus, federal regulation does not preclude state taxation and state tax-*

*ation does not preclude federal regulation.* Compare, for example, Heisler v. Thomas Colliery Co. 260 US 245, 67 L ed 237, 43 S Ct 83, with Sunshine Anthracite Coal Co. v. Adkins, 310 US 381, 84 L ed 1263, 60 S Ct 907." (Our italics.)

The express statement that federal regulation does not preclude state taxation is significant when it is borne in mind that the opinion in the Polish Alliance case was handed down on the same day that the opinion in the South-Eastern Underwriters case was handed down and that Mr. Justice Black who wrote the prevailing opinion in the South-Eastern Underwriters case concurred in the opinion in the Polish Alliance case.

In the case of *Lincoln National Life Ins. Co. v. Read,* 325 U. S. 673, 65 S. Ct. 1220, decided June 11, 1945, we revert to the old type of case where a state statute is involved. A statute of Oklahoma assessed a premium tax upon foreign insurance companies, and not upon domestic insurance companies. Apparently the statute was substantially the same as the Indiana statute before the Court in this case and notwithstanding the opinion in the South-Eastern Underwriters case, the Oklahoma statute was upheld. It is true that the attack was based upon the equal protection clause of the Fourteenth Amendment to the Federal Constitution and that the commerce clause was not relied on.

The decision was based upon the right of states to place conditions upon the right of foreign corporations to come into the state to do business, but this right cannot be exercised in violation of the commerce clause. Therefore it occurs to us that the fact that Mr. Justice Douglas, who concurred in Mr. Justice Black's opinion in the South-Eastern Underwriters case, allowed the Oklahoma premium receipts tax to stand is indicative that he and the others who concurred with

him in that opinion felt that the South-Eastern Underwriters case does not mean that the long enduring premium tax statute of numerous of the states contravenes this commerce clause of the Federal Constitution.

We conclude that the South-Eastern Underwriters case does not *ipso facto* invalidate the great body of state statutes regulating and taxing foreign insurance companies and transactions.

The following State cases discuss the South-Eastern Underwriters case and support our conclusion with reference to same: *Prudential Ins. Co. v. Forbes*, No. 25224 in Circuit Ct. of Ingham Co., Mich., decided Aug. 21, 1945; *Prudential Ins. Co. v. Murphy*, 35 So. (2d) 586 (So. Car.), decided Sept. 13, 1945. *Insurance Tax Cases*, 160 Kas. 300, decided Sept. 15, 1945; *First Nat. Ben. Soc. v. Garrison*, 58 F. Supp. 972, decided Jan. 16, 1945; *Keehn* v. *Hi-Grade Coal & Fuel Co.*, 41A. (2d) 525, decided Feb. 20, 1945; *Ware* v. *Travelers Ins. Co.*, 150 F. (2d) 463 (C. C. A. 9) decided June 29, 1945; *Mendola* v. *Dineen*, (1945) 185 Misc. 540, 57 N. Y. S. (2d) 219.

Since the South-Eastern Underwriters decision, however, we can no longer consider state regulation and taxation of insurance upon the Paul v. Virginia hypothesis that insurance is not commerce. In its over-all pattern the business of most large insurance companies is interstate. The question is whether all activities of such a corporation are interstate and what rights the state has to regulate the tax the local aspects and activities of the business. The trend of the more recent decisions of the Supreme Court favors the states in this respect. Even the South-Eastern Underwriters Association opinion indicates that local activities, even though tied into interstate business, may be regulated and taxed by the states. So it seems that the case that

has created the doubt itself goes far to dispel the doubt, and, as respects local phases and aspects of the business, is in line with the trend toward greater liberality for state regulation and taxation of some phases of interstate commerce.

As we have already pointed out, the Supreme Court held in the Polish National Alliance case, supra, that

"federal regulation does not preclude state taxation and state taxation does not preclude federal regulation." In *Cloverleaf Butter Co.* v. *Patterson* (1942), 315 U. S. 148, 155, 156, 86 L. Ed. 754, 62 S. Ct. 491, the same idea is amplified in the following language:

"It has long been recognized that in those fields of commerce where national uniformity is not essential, either the state or federal government may act. Willson v. Black Bird Creek Marsh Co. 2 Pet (US) 245, 7 L ed 412; California v. Thompson, 313 US 109, 114, 85 L ed 1219, 1221, 61 S Ct 930. Where this power to legislate exists, it often happens that there is only a partial exercise of that power by the federal government. In such cases the state may legislate freely upon those phases of commerce which are left unregulated by the nation. . . ."

The facts before us clearly show that uniformity in the regulation and taxation of insurance is not essential. Diverse legislation by the different states for over 75 years without attempt at federal interference proves this. With the Sherman Act as the only regulation of insurance by Congress, the remaining field is open to the states. The Indiana Premium Tax Statute does not conflict with the Sherman Act or its purpose, and therefore covers a phase of regulation left to the states.

In the case of *Southern Pac. Co.* v. *State of Arizona* (1945), 325 U. S. 761, 65 S. Ct. 1515, 1519, the doctrine of power in the state to make laws governing matters

of local concern is reaffirmed. This case was decided by the Supreme Court on June 18, 1945, and the following language is used:

"Although the commerce clause conferred·on the national government power to regulate commerce, its possession of the power does not exclude all state power of regulation. Ever since *Willson* v. *Black Bird Creek Marsh Co.*, 2 Pt. 245, 7 L. Ed. 412, and Cooley v. Board of Wardens, 12 How. 299, 13 L. Ed. 996, it has been recognized that, in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it. (Citing cases.)"

Other late cases hold that states may tax and regulate interstate commerce if they do not unduly burden it. *General Trading Co.* v. *State Tax Commission* (1944), 322 U. S. 335, 88 L. Ed. 1309, 64 S. Ct. 1028; *Parker* v. *Brown* (1943), 317 U. S. 341, 87 L. Ed. 315, 63 S. Ct. 307; *Illinois Nat. Gas Co.* v. *Central Ill. Publ. Serv. Co.* (1942), 314 U. S. 498, 86 L. Ed. 371, 62 S. Ct. 384; *South Carolina Highway Dept.* v. *Barnwell Bros.* (1938), 303 U. S. 177, 82 L. Ed. 734, 58 S. Ct. 510; *California* v. *Thompson* (1941), 313 U. S. 109, 85 L. Ed. 1219, 61 S. Ct. 930; *Duckworth* v. *Arkansas* (1941), 314 U. S. 390, 86 L. Ed. 294, 62 S. Ct. 311; *McGoldrick* v. *Berwind-White Coal Min. Co.* (1940), 309 U. S. 33, 83 L. Ed. 565, 60 S. Ct. 388.

What constitutes an undue burden upon interstate commerce by reason of a local tax cannot be generally defined. In some of the earlier cases validity was tested by more or less mechanical or categorical rules, but the tendency now is to weigh and balance the interests of the State against the national interests, and compose the competing de-

mands of the state and nation, and courts have looked to the nature of the state regulation, its objective and its effect. *Illinois Nat. Gas Co.* v. *Central Ill. Pub. Serv. Co.* (1942), 314 U. S. 498, 505, 86 L. Ed. 371, 62 S. Ct. 384; *United States* v. *South-Eastern Underwriters Assn., supra.*

In the case of *Pacific Telephone & Telegraph Co.* v. *Tax Commission* (1936), 297 U. S. 403, 414, 80 L. Ed. 760, 56 S. Ct. 522, it was stated that a tax upon a local business would not be void, if, despite its burden, the local business is conducted at a profit. It has also been suggested that reasonableness is a fair test of the validity of such a tax. Gavit, The Commerce Clause, page 23; Willis, Constitutional Law, 309, 310. Testing the case before us by these cases and rules, we think the tax imposes no undue burden on appellee or the national interest. The interests of the State and nation seem rather evenly matched. The object of the state obviously is to raise necessary revenue to support government and governmental activities which necessarily mean benefit to a corporation with so large a stake in the state. There is no remote indication that the statute and the tax imposed thereunder is a manifestation of hostility. Appellee has made money and its business in Indiana has multiplied. Foreign insurance companies subject to the act have outdistanced domestic companies which are free from the act.

In addition to their claim that the statute unduly burdens interstate commerce, appellee also claims that it discriminates against interstate commerce. It recognizes that the burden upon interstate commerce which is forbidden is an "undue" burden, but it does not recognize any limitation upon the discrimination against interstate commerce which is forbidden. It says there can be *no* discrimination. It seems to us that the phi-

losophy which qualifies the burden permitted would also qualify the discrimination forbidden and apply the prohibitions only to such discrimination as would prejudice or harm the interstate business involved.

In the case of *Nelson* v. *Sears, Roebuck & Co.* (1941), 312 U. S. 359, 366, 85 L. Ed. 888, 61 S. Ct. 586, *"prohibited* discriminatory burdens on interstate commerce" are referred to. (Our italics.) This reference seems to indicate that not all discrimination is prohibited. In the case of *General Trading Co.* v. *State Tax Com., supra,* the words "practically discriminatory towards interstate commerce" are used. This again indicates that not all discrimination is fatal, but only that which considered practically is prejudicial. In 51 American Jurisprudence 274, the subject of discrimination is discussed and the following language is used:

> ". . . Discrimination against such commerce, like the commerce itself, is a practical conception, and must involve a *substantial distinction* and *a real injury.* Whether a taxing statute unconstitutionally discriminates against such commerce is to be determined not by the ostensible reach of its language, but by its practical operation." (Our italics.)

This statement from the text of American Jurisprudence is supported by reference to *Gregg Dying Co.* v. *Query* (1932), 286 U. S. 472, 76 L. Ed. 1232, 52 S. Ct. 631, and *Best & Co., Inc.* v. *Maxwell* (1940), 311 U. S. 454, 85 L. Ed. 275, 61 S. Ct. 334, and indicates that the question of discrimination must be considered practically and realistically and that the discrimination must be substantial and lead to positive prejudice. There is no practical or prejudicial discrimination imposed against foreign insurance companies by the Indiana statute. The difference in treatment that exists has done no harm, and for the same reasons that we have felt that there was no undue burden imposed upon inter-

state commerce we think that there has been no practical prejudicial discrimination against it.

Gross receipts taxes upon persons or corporations engaged in interstate commerce, if properly apportioned or otherwise limited to receipts from business done within the state, even though a phase of interstate commerce, have been upheld. *Treasury of Indiana* v. *Wood Preserving Corp.* (1941), 313 U. S. 62, 85 L. Ed. 1188, 61 S. Ct. 885; *McGoldrick* v. *Berwin-White Coal Min. Co., supra; Western Live Stock* v. *Bureau of Revenue* (1938), 303 U. S. 250, 255, 82 L. Ed. 826, 58 S. Ct. 546; *United States Exp. Co.* v. *Minnesota* (1912), 223 U. S. 335, 56 L. Ed. 459, 32 S. Ct. 211; *Cudahy Packing Co.* v. *Minnesota* (1918), 246 U. S. 450, 62 L. Ed. 827, 38 S. Ct. 373; *Pullman Co.* v. *Richardson* (1923), 261 U. S. 330, 67 L. Ed. 682, 43 S. Ct. 366.

The case of *Treasury of Indiana* v. *Wood Preserving Corp., supra,* originated in Indiana and clearly points the answer in the case before us. In that case contracts were made outside Indiana between two non-residents of Indiana for the sale of railroad ties. The seller obtained the ties from producers in Indiana and delivered them to the buyer in Indiana on cars for immediate shipment out of the state. Payment for the ties was made by the seller in Pennsylvania. The court held that the transaction was taxable under the Indiana Gross Income Tax law and beginning at the bottom of page 67 said:

". . . Respondent was in Indiana acting through its agent at the designated points on the railroad line. The Railroad Company was at the same points represented by its inspector. The ties brought there by the producers were then examined and those found by the inspector to be in accordance with specifications were accepted. In these transactions, respondent through its agent at once accepted from its vendors the ties which the Railroad

Company found satisfactory and then and there sold and delivered these ties to the Railroad Company. These were local transactions,—sales and deliveries of particular ties by respondent to the Railroad Company in Indiana. The transactions were none the less intrastate activities because the ties thus sold and delivered were forthwith loaded on the railroad cars to go to Ohio for treatment. . . ."

The similarity of the facts in the Wood Preserving Corp. case to the facts in the case before us is striking. In the case before us the insurance policies upon which the taxed premiums were paid were all consummated in Indiana just as the sale of ties by the Wood Preserving Corporation case was consummated in Indiana. In the Wood Preserving Corporation case the sale of the ties fitted into an interstate transaction. In like manner, the sale of insurance policies involved in the case before us fits into the general insurance business of the appellee, but the Indiana business of appellee remained intrastate in nature just as the sale of Wood Preserving Corp. ties in Indiana, as a part of an interstate transaction, remained an intrastate activity. This Wood Preserving Corp. case was considered and discussed in the case of *International Harvester Co.* v. *Department of Treasury* (1944), 322 U. S. 340, 344, 88 L. Ed. 1313, 1317, 64 S. Ct. 1019, where the following language is used:

". . . But as we held in the Wood Preserving Corp. case, neither the Commerce Clause nor the Fourteenth Amendment prevent the imposition of the tax on receipts from an intrastate transaction *even though the total activities from which the local transaction derives may have incidental interstate attributes.*" (Our italics.)

Another case recognizing the rights of the state to levy a tax on a transaction, some aspects of which are

clearly interstate in character, is *McGoldrick* v. *Berwin-White Coal Min. Co.,* supra. This case involved the validity of the New York City tax upon sales of goods for consumption. The Coal Company shipped coal from outside the state direct to a consumer in New York City and the sales tax was assessed. The State courts held that the taxing statute, as applied to the transaction involved, violated the commerce clause. The Supreme Court, however, reversed and pointed out that it is not the purpose of the commerce clause to relieve those engaged in interstate commerce of their just share of state tax burdens merely because an incidental or consequential effect of the tax is an increase in the cost of doing business. It further pointed out that not all state taxation is to be condemned because, in some manner, it has an effect upon commerce between the states, and that there are many forms of tax whose burdens, when distributed through the play of economic forces, affect interstate commerce, which nevertheless fall short of the regulation of commerce which the Constitution leaves to Congress.

At page 47, the Court used the following language:

"... A tax may be levied on net income wholly derived from interstate commerce. Nondiscriminatory taxation of the instrumentalities of interstate commerce is not prohibited. ... Nor is taxation of a local business or occupation, which is separate and distinct from the transportation or intercourse which is interstate commerce, forbidden merely because in the ordinary course such transportation or intercourse is induced or occasioned by such business, or is prerequisite to it. Western Live Stock v. Bureau of Revenue, supra (303 US 253, 82 L ed 826, 58 S Ct 546, 115 ALR 944) and cases cited."

The case of *Keehn* v. *Hi-Grade Coal & Fuel Co.* (1945), 23 N. J. Misc. 102, 41 A. (2d) 525, 529, discusses

the effect of the South-Eastern Underwriters Association case upon the "net work of legislation," comprising the New Jersey insurance law, and in considering the validity of New Jersey statutes applying to foreign insurance companies the court said:

"Thus, if an out-of-state insurance company, instead of merely accepting an application from a New Jersey resident in Illinois and writing its policy there, and thereafter mailing it to the resident, actually does business in New Jersey, by having a representative solicit such policy, procure same, obtain payment of the premium and, perchance, as well inspect and supervise the property covered, all within the State of New Jersey, it would seem that these acts are all intrastate activities, 'and therefore subject to state control.' "

We are not unmindful that it has often been said that states may not tax the privilege of engaging in interstate commerce. The Indiana statute does not offend against this rule. It is true that the Indiana statute under consideration says that the three (3) per cent tax shall be paid "for the privilege of doing business in this state." But the business of appellee done in Indiana is, as we have shown, purely local and intrastate in character and a tax upon a local privilege "must be held valid in the absence of proof that it imposes an undue burden on interstate commerce." *Pacific Telephone & Telegraph Co.* v. *Tax Commission, supra; Cheney Bros. Co.* v. *Massachusetts* (1918), 246 U. S. 147, 38 S. Ct. 295; *Willis, Constitutional Law,* 313.

Appellee also contends that the Indiana statute contravenes the equal protection clause of the Fourteenth Amendment to the Federal Constitution. The case of *Lincoln Nat. Life Ins. Co.* v. *Read, supra,* decided June 11, 1945, involved a premium tax very

similar to the Indiana tax. The question was squarely presented and it was held that the Oklahoma statute did not violate the Fourteenth Amendment. The case seems conclusive against appellee upon this point.

We now come to a consideration of the McCarran-Ferguson Act, which was passed by Congress on March 9, 1945. Its purpose very obviously was to dispel the doubts as to validity of all state regulation and taxation of insurance which the opinion in the South-Eastern Underwriters case had created, not only in the minds of insurance men, but also in the minds of state officials responsible for the protection of the people of their respective states against possible unfair or unsafe insurance practices and also in the minds of state legislators responsible for the nice task of discovering tax sources by which to maintain the solvency of state activities. By this Act Congress declared that "the continued regulation and taxation by the several states of the business of insurance is in the public interest" and that, "The business of insurance, and every person engaged therein, shall be subject to the laws of the several states which relate to the regulation or taxation of such business." Of course Congress cannot delegate its power or enlarge the power of the states, but by the Constitution Congress is given the right to regulate interstate commerce, which right it may exercise in its discretion. It may fail to act and leave large fields of regulation open to the states. Or in its power of regulation, it may act affirmatively and as a part of its regulation permit the states "to regulate interstate commerce or impose burdens upon it." In our opinion, the McCarran-Ferguson Act is an exercise of the right of Congress to regulate interstate phases and aspects of the insurance business, by authorizing the states to continue their regulation and taxation of

such business in the manner developed over 75 years of experience. The following late cases are authority for this conclusion.

In *Cloverleaf Butter Co.* v. *Patterson, supra,* the Supreme Court in 1942 stated the rule in the following words in note 4 on page 155:

> "Where the federal legislation *authorizes state action, such state action is permissible even as to matters which could otherwise be regulated only by uniform national enactments.* (Citing cases.)" (Our italics.)

In *Southern Pac. Co.* v. *State of Arizona,* decided June 18, 1945, the right of Congress to permit the states to regulate commerce in a manner which would otherwise not be permissible was expressed in the following language on page 1520 of 65 S. Ct. Rep.:

> "Congress has undoubted power to redefine the distribution of power over interstate commerce. *It may either permit the states to regulate the commerce in a manner which would otherwise not be permissible, In* re Rahrer, supra, 140 U. S. 561, 562, 11 S. Ct. 865, 869, 35 L. Ed. 572; Adams Express Co. v. Commonwealth of Kentucky, 238 U. S. 190, 198, 35 S. Ct. 824, 826, 59 L. Ed. 1267, L. R. A. 1916C, 273, Ann. Cas. 1915D, 1167; Rosenberger v. Pacific Express Co. 241 U. S. 48, 50, 51, 36 S. Ct. 510, 60 L. Ed. 880; James Clark Distilling Co. v. Western Maryland Ry. Co., 242 U. S. 311, 325, 326, 37 S. Ct. 180, 185, 61 L. Ed. 326, L. R. A. 1917B, 1218, Ann. Cas. 1917B, 845; Whitfield v. State of Ohio, 297 U. S. 431, 438, 440, 56 S. Ct. 532, 534, 80 L. Ed. 778; Kentucky Whip & Collar Co. v. Illinois Cent. R. Co., 299 U. S. 334, 350, 57 S. Ct. 277, 282, 81 L. Ed. 270; Hooven & Allison v. Evatt, 323 U. S. __, 65 S. Ct. 870, 883, . . ." (Our italics.)

And again in a still later case decided by the Supreme Court December 3, 1945, to-wit: *International Shoe Co.*

v. *State of Washington,* (1945) 326 U. S. 310, the following language is used:

"Appellant's argument, renewed here, that the statute imposes an unconstitutional burden on interstate commerce need not detain us. For 53 Stat. 1931, 26 U. S. C. § 1606(a) provides that 'No persons required under a State law to make payments to an unemployment fund shall be relieved from compliance therewith on the ground that he is engaged in interstate or foreign commerce, or that the State law does not distinguish between employees engaged in interstate or foreign commerce and those engaged in intrastate commerce.' *It is no longer debatable that Congress, in the exercise of the commerce power, may authorize the states, in specified ways, to regulate interstate commerce or impose burdens upon it. Kentucky Whip & Collar Co.* v. *Illinois Central R. Co.,* 299 U. S. 334; *Perkins* v. *Pennsylvania,* 314 U. S. 586; *Standard Dredging Co.* v. *Murphy,* 319 U. S. 306, 308; *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652, 679; *Southern Pacific Co.* v. *Arizona,* No. 56, 1944 Term, decided June 18, 1945, slip opinion p. 6." (Our italics.)

See also *Cooley* v. *Post Warden,* 53 U. S. 299, 13 L. Ed. 996; *Cloverleaf Butter Co.* v. *Patterson, supra; In re Rahrer* (1891), 140 U. S. 545, 35 L. Ed. 572, 11 S. Ct. 865; *Clark Distilling Co.* v. *Western Maryland Ry. Co.* (1917), 242 U. S. 311, 61 L. Ed. 326, 27 S. Ct. 180, 56 S. Ct. 532; *Whitfield* v. *State of Ohio* (1936), 297 U. S. 431, 80 L. Ed. 778; *Kentucky Whip & Collar Co.* v. *Illinois Cent. R. Co.* (1937), 299 U. S. 334, 81 L. Ed. 270, 57 S. Ct. 277.

We conclude that by the McCarran-Ferguson Act Congress exercised its power to regulate interstate commerce, and even if the Indiana premium tax statute were otherwise bad, Congress has given it effect.

The following cases discuss the McCarran-Ferguson Act and support our conclusion with reference to same: *Prudential Ins. Co.* v. *Forbes,* No. 25224 in Circuit Ct.

of Ingham Co., Mich., decided Aug. 21, 1945; *Prudential Ins. Co.* v. *Murphy, supra; Insurance Tax Cases*, 160 Kas. 300, decided Sept. 15, 1945; *Mendola* v. *Dineen, supra.*

The judgment is reversed with instructions to sustain the motion for a new trial and to enter judgment for the defendant upon the stipulated facts.

Note.—Reported in 64 N. E. (2d) 150.